# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 19, 2012

## STATE OF TENNESSEE v. DAVID EDWARD NILES

**Appeal from the Circuit Court for Bedford County**
No. 16973     Robert G. Crigler, Judge

---

**No. M2011-01412-CCA-R3-CD - Filed June 1, 2012**

---

The Defendant-Appellant, David Edward Niles, was convicted by a Bedford County jury of first degree premeditated murder and was sentenced by the trial court to life imprisonment. On appeal, Niles argues:  (1) the trial court erred in denying his motion to suppress evidence seized during the search of his residence; (2) the evidence was insufficient to sustain his conviction; and (3) the trial court abused its discretion in denying his ex parte motion for funds for a psychiatrist.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined and JERRY L. SMITH, J., not participating.

Donna Orr Hargrove, District Public Defender; James O. Martin, III, Nashville, Tennessee; and Andrew Jackson Dearing, Assistant Public Defender, Shelbyville, Tennessee, for the Defendant-Appellant, David Edward Niles.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the January 11, 2010 shooting death of victim Laura Parker.  Niles, who had a four-year-old son with the victim, was arrested for this crime.  He subsequently filed an ex parte motion for funds for a psychiatrist and a motion to suppress the evidence seized during the search of his home.

**Ex parte Motion for Funds for Psychiatrist.** On July 8, 2010, the trial court heard Niles's ex parte motion for funds to hire a psychiatrist. One of Niles's attorneys, an assistant public defender, testified that the public defender's office was first appointed to Niles's case after the case was presented to the grand jury. Defense counsel stated that, upon reviewing Niles's statements furnished by the State in their discovery responses, he discovered that Niles had informed Officer Farrell at the Bedford County Jail that God told him to kill the victim because the victim was an unfit mother to their four-year-old son. Defense counsel said he was unaware of this statement prior to receiving the discovery responses from the State.

When defense counsel talked to Niles about his statement to Officer Farrell, Niles informed him that he had heard voices telling him to kill the victim and that he had been hearing these voices for some time prior to the offense. Niles told defense counsel that he originally thought it was God's voice telling him to kill the victim but now believed that "it might have been the devil" telling him to commit this crime. Defense counsel said he was aware that Niles and the victim had been involved in a contested custody dispute over their son, which was evidenced in letters between Niles and the victim. He also said Niles appeared to have average or perhaps above average intelligence, which was why he was not seeking funds for a neuro-psychologist. However, defense counsel said he was concerned that Niles might have "some sort of issue [with] schizophrenia or something underlying, something we need to investigate that we need the expert services for [sic]."

Defense counsel acknowledged that Niles appeared to understand the punishment he was facing for first degree premeditated murder. However, he believed that Niles's expectations regarding his punishment were "somewhat unreasonable." Defense counsel said he believed that there was a particularized need to have Dr. Stephen Montgomery, a psychiatrist, examine Niles's mental state:

> Whenever someone raises questions about hearing voices[,] and they indicate something delusional, we don't have the expertise to tell whether or not that is the case or what they are suffering from [sic]. So, it is [a situation in which] we need the services of someone that is able to provide a diagnosis . . . .

At that point, a second defense attorney informed the court that he had spoken with Dr. Montgomery, who said he could evaluate Niles and perform the necessary testing "rather quickly" once he got the trial court's approval. When the trial court asked if a mental evaluation had already been conducted, the first defense attorney responded that he believed a standard forensic evaluation had been performed on Niles at the general sessions level but that he was unaware of the results of that evaluation. The court stated, "I think I am entitled to look at the court file and see what the results of that [forensic evaluation] were." The first

defense attorney then stated he believed Niles was competent to stand trial but felt he needed the psychiatrist in order to establish an insanity and diminished capacity defense. The court decided that it would take the matter under advisement. On August 20, 2010, the trial court entered an order denying the motion on the basis that Niles had failed to establish a particularized need for the expert services of a psychiatrist.

**Motion to Suppress.** On September 20, 2010, the trial court heard Niles's motion to suppress the evidence seized during the search of his residence. Detectives Brian Crews and Charles Merlo testified for the State, and Patricia Niles and William Niles testified for the defense.

Brian Crews, a detective with the Shelbyville Police Department, testified that he and Detective Merlo interviewed Niles's wife, Patricia Niles, two days after the January 11, 2010 death of the victim. He said Detective Merlo initially called Mrs. Niles to ask if she would come to the police station to discuss the case, and she appeared voluntarily for the interview. Detective Crews added that Mrs. Niles was not in custody and could have stopped the interview and left the police station at any time.

During the interview, Mrs. Niles told Detectives Crews and Merlo that there were boxes of ammunition at the home she shared with Niles. Detective Crews asked Mrs. Niles if she would allow them to go with her to her house to confirm the existence of the ammunition, and Mrs. Niles responded that "she would do anything she could to help." Detectives Crews and Merlo followed Mrs. Niles, who rode with Niles's mother and father, to her home. Upon their arrival, the detectives asked Mrs. Niles if she could show them the location of the ammunition. Mrs. Niles led the detectives to a closet in the master bedroom and showed them the ammunition located on the top shelf. She then gave them consent to seize the boxes of ammunition. At the time of this search, Mrs. Niles was in the bedroom, and Niles's parents were present in the house. Detective Crews said he took pictures of the ammunition before Detective Merlo pulled the ammunition down from the shelf.

Detective Crews said he noticed a receipt "directly underneath" the ammunition boxes when Detective Merlo picked up the boxes. Detective Crews was unsure whether the receipt came down at the same time that Detective Merlo pulled down the boxes of ammunition. However, he said he could not read the receipt until the boxes of ammunition were taken off of the shelf. The TopGlock receipt showed that "a purchase had been made for a replacement barrel for a Glock handgun" as well as "a replacement firing pin and a Glock armorer's tool." Detective Crews said he was aware that Niles had a Glock nine-millimeter handgun as well as a spare barrel, a spare firing pin, and a Glock armorer tool in his vehicle at the time he was taken into custody. He also stated that Mrs. Niles was in the bedroom when he and Detective Merlo discovered the TopGlock receipt. He said that although Mrs.

Niles did not specifically give the detectives permission to take down the receipt, she never made any objection about the receipt and did not try to prevent them from seeing any portion of the closet.

Detective Crews said he then asked Mrs. Niles if he and Detective Merlo could look around the rest of the residence, and Mrs. Niles consented. The detectives carefully looked around the home and searched through drawers in the bedroom without any objection from Mrs. Niles. While in the home, Detective Crews noticed a date planner in the kitchen. At the time he discovered the planner, he was aware that there had been some disagreements between Niles and the victim regarding her reluctance to give him her work schedule, which made the date planner important. Detective Crews asked Mrs. Niles if he could look at the planner, and Mrs. Niles asked him why it was important. He responded that everything was important because they were investigating a murder. Mrs. Niles replied that she did not want him to take the planner because it contained appointments for the entire household. After Detective Crews assured her that they would allow her to have anything she needed from the planner, Mrs. Niles consented to the detectives photographing certain parts of the planner as well as two letters between Niles and the victim. She also consented to their seizing the victim's work schedule that had been placed inside the date planner.

Detective Crews said he and Detective Merlo also asked Mrs. Niles if they could take a computer that they found inside the home. Mrs. Niles and Niles's mother objected to the detectives' seizing the computer because they did not believe that it was important. Detective Crews again responded that everything was important in a murder investigation. Niles's mother then replied that Niles's wife needed the computer for some online classes she was taking and asked if the police could make a copy of the hard drive. The detectives acknowledged that this was possible, although they would still need to briefly take the computer to copy the hard drive. After obtaining consent from Mrs. Niles to copy the computer's hard drive, Detective Crews said that they seized the computer that day, copied the hard drive, and returned the computer to Mrs. Niles the next day. He said neither he nor anyone else from the police department had reviewed the information on the computer's hard drive as of the date of the suppression hearing.

Detective Crews said that the only items taken from Niles's residence were the two boxes of ammunition, the TopGlock receipt, the victim's work schedule that was placed inside the date planner, and the computer[1] for the purposes of copying the hard drive. He said that all of these items were taken with Mrs. Niles's consent. He denied threatening or

---

[1] The trial transcript shows that instructions for the assembly and disassembly of a Glock, which were located with the ammunition and the TopGlock receipt on the closet shelf, were also seized and were admitted as an exhibit at trial.

promising Mrs. Niles anything in exchange for obtaining her consent to seize these items. Detective Crews stated that Mrs. Niles and Niles's mother and father were "very cooperative throughout the entire [search and seizure process at the residence]." He said that the only two items that Mrs. Niles and Niles's parents did not want them to seize were the entire date planner and the computer, although there were able to reach a compromise regarding these objects.

Charles Merlo, a detective with the Shelbyville Police Department, testified that Mrs. Niles voluntarily appeared at the police station and that no officers coerced her or promised her anything in exchange for her cooperation. Detective Merlo confirmed that Mrs. Niles told him and Detective Crews about the boxes of ammunition that were in a closet at her home. He said that when Detective Crews asked Mrs. Niles if she would allow them to go to her house to retrieve the boxes of ammunition, she consented.

Detective Merlo said he and Detective Crews followed Mrs. Niles and her in-laws to her home. Upon their arrival, Mrs. Niles led the two detectives to a closet in the master bedroom. Detective Merlo said that after pictures were taken of the ammunition on the shelf, he picked up the two boxes of ammunition. As he picked up the ammunition, he saw the TopGlock receipt move because it was lying next to the boxes. The receipt was for the purchase of a replacement barrel, replacement firing pin, and a Glock tool. Detective Merlo said he was aware at the time of the search that a spare barrel, spare firing pin, and Glock tool had been found in Niles's car. He was also aware that Niles had made statements to Officer Farrell about his knowledge of defeating ballistics tests by using a different barrel and firing pin in the weapon. Detective Merlo said that during the search Mrs. Niles observed him picking up the boxes of ammunition and the receipt and that she never objected to his and Detective Crews's looking at that evidence. He also said that Mrs. Niles heard him tell Detective Crews that the receipt was for the extra barrel and firing pin that had been found in Niles's car and that she did not object to their seizure of the receipt. Detective Merlo said he and Detective Crews seized the two boxes of ammunition and the receipt. He said that the receipt, as well as the receipt's TopGlock heading, were in plain view when he picked up the boxes of ammunition. He acknowledged that at the time he picked up the boxes of ammunition and the receipt, he only had Mrs. Niles's permission to seize the ammunition.

Detective Merlo stated that Mrs. Niles did object to the detectives' seizing the entire date planner, although she was willing to allow the detectives to take the victim's work schedule and the letters between Niles and the victim that were inside the planner. He said they honored her wishes and took only the portions of the date planner to which she consented. He also said he and Detective Crews also honored Mrs. Niles's objection to them taking the computer for a lengthy period of time. Instead, the computer was taken for the

purpose of copying the hard drive, and Mrs. Niles picked up the computer from the police station the next day. Detective Merlo said that the only thing that Mrs. Niles objected to their seizing was the entire date planner. He did not recall anyone making any threats to Mrs. Niles about obtaining a search warrant if she objected to their seizing certain evidence; however, he did remember Detective Crews telling Mrs. Niles that they were investigating a murder and they needed the evidence so that they could try to determine what had happened in this case. At that point, Mrs. Niles told the detectives that they could photograph the sections of the date planner they wanted.

Patricia Niles, Niles's wife, testified that on January 13, 2010, she received a phone call to come to the police station for questioning. She said she agreed to talk to the police and that her in-laws accompanied her to the police station. During the interview, she gave Detectives Crews and Merlo permission to come to her house for the purpose of seizing the boxes of ammunition purchased by Niles. Mrs. Niles said she offered to retrieve the ammunition for the detectives, but they told her that they had to retrieve it themselves.

Mrs. Niles said she led the detectives directly to the master bedroom and showed them the ammunition in the closet. She recalled them taking pictures of the objects on the shelf before Detective Merlo picked up the boxes of ammunition, although she could not remember seeing a receipt with the boxes of ammunition. Mrs. Niles said she did not give the detectives permission to take anything from the bedroom except the two boxes of ammunition. She acknowledged that the detectives discussed the TopGlock receipt in her presence and that she said nothing to the detectives indicating they did not have permission to look at or seize the receipt along with the ammunition. She said that when she allowed the detectives into her house it was only for the purpose of seizing the two boxes of ammunition.

Mrs. Niles said that after the detectives seized the ammunition, she and the detectives went into her kitchen, and she refused to allow them to take a date planner and some letters inside the planner. She agreed to allow them to make photographs of parts of the date planner but objected to them taking the entire date planner because it contained household appointments. Although she did not recall the detectives' seizing the letters between Niles and the victim, she did not dispute the detectives' testimony that she had given them permission to take these letters.

Mrs. Niles also said she initially objected to the detectives' seizing her computer. She remembered someone making the suggestion that the detectives could copy the computer's hard drive. At that point, Detective Crews told her that if she did not give them the evidence they wanted they "would come back with a search warrant and tear up [her] house." After Detective Crews made this comment, she agreed to allow the detectives to seize her computer

because she felt threatened. She allowed them to copy the hard drive, and they returned the computer to her two days later. She acknowledged that at the time she felt threatened, the detectives had already seized the boxes of ammunition, the TopGlock receipt, the date planner, and the letters between Niles and the victim.

Mrs. Niles denied giving the detectives permission to seize anything other than the boxes of ammunition. However, she acknowledged that she allowed the detectives to photograph parts of her date planner and to seize letters that were in the date planner. She also acknowledged that, although she did not want the detectives to take the computer, she ultimately gave them permission to seize it. She further acknowledged that she told the detectives at the police station that she would do whatever she could to help them. She said that her interview with the detectives was cordial "to an extent." She said she never signed a consent form allowing them to search her home or to seize any evidence.

William Niles, Niles's father, testified that he drove Niles's wife to the police station to be interviewed, although he was not present during the interview itself. He said that although Niles's wife told the detectives that she would retrieve the ammunition, Detective Crews informed her that they had to personally retrieve the ammunition. He said that while Niles's wife consented to the detectives' entry into the house, they never talked about the seizure of anything other than the ammunition.

William Niles said that no papers fell off of the shelf at the time that the detectives picked up the boxes of ammunition; instead, the detectives began pulling papers off of the shelf and reviewing them. He said Niles's wife had not given them permission to look at the papers on the shelves; however, he admitted that she did not object to them reviewing the papers. He acknowledged that the detectives were not trying to hide the papers they were reviewing. He also admitted that the detectives did not try to hide the fact that they were reviewing the papers.

William Niles also acknowledged that Niles's wife saw the detectives take the boxes of ammunition and some papers from the closet and did not object. William Niles later saw Detective Crews talking to Niles's wife about a date planner in the kitchen. He stated that although Niles's wife unequivocally objected to Detective Crews's seizing the date planner, Detective Crews took the date planner anyway. William Niles did not remember any discussion about the detectives' making photographs of the planner and did not see them seize any letters.

William Niles said that even though Niles's wife objected to the detectives' seizing the computer, Detective Crews told Detective Merlo to seize it anyway. He recalled a discussion about copying the computer's hard drive but remembered Detective Crews telling

Niles's wife that they would be taking the computer. He also recalled a discussion between Detective Crews and Niles's wife about a search warrant. The detectives told Niles's wife that if she did not allow them to take the computer, they would return with a search warrant and "trash [her] house." William Niles said that Niles's wife was "pushed into" allowing the detectives to take her computer.

In rebuttal, Detective Crews said he did not remember any discussion with Niles's wife regarding a search warrant, and he adamantly denied making any threats to her that they would "tear up" her house. He said that every time the detectives and Niles's wife encountered a difficulty regarding the evidence, they resolved the difficulty with a compromise, like photographing portions of the date planner or copying the hard drive from the computer. He said his training had taught him that he could not threaten to tear up an individual's house pursuant to a search warrant. Detective Crews said he and Detective Merlo felt welcome in the home, except during the small disagreements regarding the planner and the computer that were quickly resolved. He also said that if Niles's wife had revoked her consent at any point during the search, he and Detective Merlo would have promptly left the home.

At the conclusion of the hearing, the trial court denied the motion to suppress after finding that the search and seizure of the home was conducted with the consent of Niles's wife.

**Trial.** At approximately 8:30 p.m. on January 11, 2011, Isaac Williams and Timothy Farliss were moving some furniture at the Forest Hill Apartments when they heard two gunshots. Williams immediately called 911. While Williams was on the phone with the 911 dispatcher, he walked toward the sound of the gunshots and saw a white Nissan vehicle with tinted windows driving away from the complex with its lights off. The car did not turn on its headlights until it was almost out of the parking lot. Then the white car turned left out of the lot. Williams relayed the description of the car to the 911 dispatcher. Farliss also saw this car before it left the parking lot. An instant later, Williams heard someone scream that a person had been shot, and he called 911 a second time to tell them to send an ambulance. Williams walked toward the sound of the person screaming and observed the body of the deceased victim, who had been shot in the head.

The officers who responded to the scene found two nine-millimeter shell casings manufactured by Speer and a bullet hole just to the right side of the victim's apartment door. Officers were unable to find the bullet that struck the area to the right side of the victim's door.

As Sergeant James Wilkerson and Lieutenant Jason Williams were responding to the incident, they received the description of the vehicle seen leaving the crime scene. At the time they received the description, they passed a small white car with tinted windows. They immediately turned around and stopped this vehicle. Sergeant Wilkerson approached the driver, later identified as the Defendant-Appellant, David Edward Niles, and informed him that police were investigating a shooting and that his vehicle matched the description of the vehicle leaving the scene. He then asked the driver for his license, and Niles responded that he did not have any identification with him.

Sergeant Wilkerson next asked Niles if he had a firearm in the vehicle. Niles responded affirmatively and reached for a nine-millimeter Glock handgun. Sergeant Wilkinson grabbed Niles and pulled him out of his vehicle. He did a quick pat-down, handcuffed him, read him his Miranda rights, and placed him in the back of his patrol car. He then asked for his name, which Niles provided. Niles asked Sergeant Wilkerson to call his wife to notify her of his whereabouts. A short time later, Williams and Farliss identified Niles's vehicle as the vehicle they saw leaving the crime scene.

When Niles was placed in the patrol car, Sergeant Wilkerson and Lieutenant Williams looked inside Niles's vehicle, they observed a black ski mask, a black baseball cap, a pair of gloves, a white towel, a handgun case, and a nine-millimeter Glock handgun in plain view on the front passenger seat. A firearm trace of the handgun showed that Niles owned the gun and had purchased the gun and a box of Speer nine-millimeter ammunition from the Outpost Armory with his debit card on December 19, 2009.

As Officer Wilkinson retrieved a crime scene log-in sheet from the backseat of his patrol car, Niles told him that he and his wife were having marital difficulties and that he had been driving the roads with the gun, trying to clear his mind. Officer Wilkinson asked Niles if he had shot the gun that night, and Niles replied that he had shot it twice in the air on a deserted road. Officer Wilkerson then called Mrs. Niles and asked if she and Niles had been having marital difficulties, and she responded that this was not the case. Officer Wilkinson then drove Niles to the Shelbyville Police Department.

The Glock that was found in Niles's car had thirteen rounds in it, including one round in the chamber. The Glock's magazine had a maximum capacity of fifteen rounds. The rounds were nine-millimeter Luger hollow points, which were manufactured by Speer. The hollow point rounds were designed to expand on impact, thereby causing serious injuries. The shell casings found at the crime scene matched the ammunition found in Niles's car. Testing by the Tennessee Bureau of Investigation (TBI) confirmed that the shell casings at the crime scene had been fired from the Glock handgun recovered from Niles's car. Officers

later found a box of Speer nine-millimeter Luger hollow point rounds in Niles's home. Although the box held twenty rounds, only five were in the box at the time it was recovered.

In addition to the fully assembled Glock handgun, the officers found a spare Glock firing pin, a spare Glock barrel, and a Glock disassembly tool in the handgun case in Niles's car. The officers also discovered that the serial number stamped on the barrel of the recovered Glock differed from the serial number on the Glock's frame and slide, despite the fact that the serial numbers for these parts were supposed to be identical. However, the serial number of the spare Glock barrel found in the handgun case was identical to the serial number on the Glock's frame and slide. TBI testing showed that the shell casings found at the scene exhibited signs that they were fired with a different barrel and firing pin than the stock barrel and firing pin found in the handgun case in Niles's car.

One of the gloves found in Niles's car showed traces of gunshot primer residue, which indicated that the glove had been in contact with or near a gun when it was fired. Papers found in the victim's car showed that Niles and the victim had a four-year-old son together. Officers also discovered that the victim had recently been giving her work schedule to Niles.

Sometime after the victim's murder, Detectives Crews and Merlo became aware that the barrel of the handgun found in Niles's car had a different serial number than the number on the gun's slide and the frame. On January 13, 2010, Detectives Crews and Merlo interviewed Niles's wife at the police station, and she gave the detectives permission to seize some boxes of ammunition that were in the home she shared with Niles. During this search, the detectives seized two boxes of ammunition, including the twenty-round box of Speer hollow point ammunition with only five rounds remaining, and the TopGlock receipt showing that Niles purchased a replacement firing pin, a replacement barrel, and a Glock disassembly tool prior to the victim's death. This evidence was found on the top shelf of the closet in the master bedroom. The TopGlock receipt was dated December 20, 2009, the day after Niles bought the Glock at the armory. In addition, the detectives found a date planner in Niles's home that contained the victim's work schedule, including her work schedule for the date of her death.

While in jail, Niles spoke to Officer Cameron Farrell shortly after midnight on January 14, 2010. Niles told Officer Farrell numerous times that "he knew it would sound crazy" but that "God told him to kill [the victim]." Niles told Officer Farrell that the victim was "an unfit mother" to their son. He also told Officer Farrell that he considered leaving the victim's apartment complex because he believed that God had told him not to kill the victim but that he changed his mind and decided to kill the victim. He said he stopped his vehicle, got out, and took two steps towards the victim before shooting her in the head with the first shot. He said he shot the victim a second time, but he was not sure where the bullet struck

her. Niles said the victim never saw his face because he was wearing a ski mask. He also told Officer Farrell that he had done online research about defeating ballistics testing by using a replacement barrel and firing pin in the gun. Niles then asked to speak with a "short heavy-set detective" who was identified by Officer Farrell as Detective Merlo. Officer Farrell subsequently talked to Detective Merlo about the information that Niles had just given him regarding the case. At Detective Merlo's request, Officer Farrell completed a report regarding the conversation he had with Niles. However, Detective Merlo was unable to speak with Niles about his conversation with Officer Farrell.

The victim's autopsy confirmed that she had been shot in the head and neck with a gun at an indeterminate range. The report stated that the victim's cause of death was multiple gunshot wounds. It also determined that the gunshot wound to her head or her neck could have resulted in her death. The copper-plated lead fragments found in the victim's body were consistent with the Speer cartridge cases for the rounds found in the Glock handgun in Niles's car and the ammunition found in Niles's home. The rifling marks on the fragments found were also consistent with rifling marks produced by Glock firearms.

After the close of proof, the jury convicted Niles of first degree premeditated murder, and the trial court sentenced him to life imprisonment. He subsequently filed a timely motion for new trial, which was denied. Niles then filed a timely notice of appeal.

## ANALYSIS

**I. Motion to Suppress.** Niles contends that the trial court erred in denying his motion to suppress evidence seized during the search of his home. Specifically, he argues that the instructions regarding the assembly and disassembly of a Glock handgun, the TopGlock receipt, the letters between Niles and the victim, and the victim's work schedule, including her schedule for the day she was killed, should have been suppressed because they were seized without a warrant and because their seizure exceeded the scope of the consent given by his wife. He also argues that the detectives, instead of limiting the search to the ammunition they had been given permission to seize, also seized the TopGlock receipt and the instructions for assembling and disassembling the gun and continued to look around the home. Moreover, following his wife's unequivocal objection to the detectives' request to seize the date planner and its contents, the detectives "coax[ed] a compromise from her where they were allowed to take what they wanted[,]" thereby unlawfully expanding her consent. See State v. Troxell, 78 S.W.3d 866, 873 (Tenn. 2002) ("Although a defendant's later expressed language, coupled with silence, may be evidence of an expansion of the scope of the consent, a defendant's silence alone cannot expand the scope of the initial consent or allow a prolonged and continued detention." (comparing United States v. Anderson, 114 F.3d at 1059, 1065 (10th Cir. 1997) (wherein the defendant's responses broadened the scope of

consent))). Finally, Niles argues that after his wife and his mother unequivocally objected to the seizure of the computer, the detectives obtained consent from his wife to copy the computer's hard drive through duress and coercion by threatening to obtain a search warrant and destroy her home. See State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992) ("In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." (citing Liming v. State, 417 S.W.2d 769, 770 (Tenn. 1967))). In response, the State contends that the record supports the trial court's finding that the warrantless search of Niles's residence was performed with the consent of his wife. We conclude that the record supports the trial court's denial of the motion to suppress.

It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. England, 19 S.W.3d 762, 766 (Tenn. 2000). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). These exceptions include: (1) stop and frisk searches; (2) searches incident to a lawful arrest; (3) searches with consent; (4) searches based on probable cause in the presence of exigent circumstances; (5) searches made in the hot pursuit of a fleeing criminal; and (6) searches of items in plain view. State v. Day, 263 S.W.3d 891, 901

n.9 (Tenn. 2008); Bartram, 925 S.W.2d at 230 n.2. The State bears the burden of proving that one of the exceptions to the warrant requirement exists. State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (citing Yeargan, 958 S.W.2d at 629).

The State contends that Niles's wife provided consent to search the home. "[A] law enforcement officer may search a person's residence without a warrant if the officer obtains the person's consent." State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). A valid consent may be given "by the individual whose property is searched . . . or by a third party who possesses common authority over the premises." State v. Ellis, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citing Schneckloth, 412 U.S. at 222). "In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." Brown, 836 S.W.2d at 547 (citing Liming, 417 S.W.2d at 770). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." Berrios, 235 S.W.3d at 109 (citing Schneckloth, 412 U.S. at 227; State v. Cox, 171 S.W.3d 174, 184 (Tenn. 2005)). The facts and circumstances in a particular case determine whether consent is sufficient. State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). The State bears the burden of establishing that the consent was freely and voluntarily given. Id. (citing State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)).

The United States Supreme Court defined the "common authority" needed to legitimize a third-party's consent to a warrantless search:

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched.

United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) (internal citations omitted). The State may satisfy its burden of proving consent by: (1) "demonstrating that the third party in fact possessed common authority[,]" or (2) "demonstrating that the facts available to the searching police officers would have warranted a man of reasonable caution in the belief that the consenting party had authority over the premises." Ellis, 89 S.W.3d at 593 (internal quotation marks omitted).

In addition, "[t]he 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence

-13-

or contraband when it is discovered in a place where the officer has a right to be." Washington v. Chrisman, 455 U.S. 1, 5-6 (1982) (citing Coolidge, 403 U.S. at 466; Harris v. United States, 390 U.S. 234, 236 (1968)). The plain view doctrine is applicable when (1) the object seized was in plain view, (2) the viewer had a right to be in the position to view the object, and (3) the incriminating nature of the object was immediately apparent. State v. Cothran, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003).

We agree with the State's assertion that Niles's wife "freely, specifically, intelligently, and unequivocally gave consent to search her and the defendant's home, without duress or coercion." We conclude that the record, when viewed in the light most favorable to the prevailing party, contained sufficient evidence to support the trial court's denial of the motion to suppress. The detectives obtained consent from Niles's wife to search the residence, and she directed the detectives to the boxes of ammunition in the home. There was no issue that Niles's wife possessed common authority to give the detectives permission to search the home. Although Niles's parents were present in the house during the search, there was no evidence presented that they objected to the detectives entering and searching their son's house.

As Detective Merlo seized the ammunition, he discovered the TopGlock receipt and the instructions for the assembly and disassembly of a Glock in plain view. The receipt and instructions were in plain view, Detective Merlo had a right to be in the position for the view since Niles's wife had given him consent to seize the ammunition, and the incriminating nature of the evidence was immediately apparent. See id. The TopGlock receipt, which showed Niles's purchase of a replacement barrel, a replacement firing pin, and the Glock tool, and the instructions regarding assembly and disassembly of a Glock handgun were incriminating because, at the time of the search, Detective Merlo was aware that the barrel of the Glock handgun found in Niles's car had a different serial number than the number on the slide and the frame of the gun. Accordingly, we conclude that the receipt and the instructions were in plain view. We further conclude that Niles's wife consented to the seizure of the receipt and instructions.

Although the record shows that Niles's wife initially objected to the detectives' attempts to seize the entire date planner and its contents and the computer, Niles's wife and the detectives were able to reach an acceptable compromise regarding these items. Niles's wife acknowledged at the suppression hearing that she consented to the detectives' photographing parts of the planner and seizing documents inside the planner. Although Niles's wife and William Niles testified that the detectives exceeded the scope of her consent, the trial court accredited the testimony of Detectives Crews and Merlo on that issue. As we have stated, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge

as the trier of fact." See Odom, 928 S.W.2d at 23. Moreover, because the evidence from the computer and the letters between Niles and the victim were never admitted at trial, any issue regarding suppression of this evidence is moot. Accordingly, we conclude that the trial court did not err in denying Niles's motion to suppress.

**II. Sufficiency of the Evidence.** Niles argues that the evidence was insufficient to sustain his conviction for first degree premeditated murder. Specifically, he argues that if the trial court had properly suppressed the evidence seized from his home, the remaining evidence of premeditation was insufficient to support his conviction. The State argues the proof was more than sufficient to support the conviction. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23. When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456–58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the

circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); Carruthers, 35 S.W.3d at 557. The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." Brown, 836 S.W.2d at 540-41 (quoting C. TORCIA, WHARTON'S CRIMINAL LAW § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly

weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, any evidence regarding the defendant's motive, and any facts regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citing 2 W. LAFAVE AND A. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 7.7 (1986)).

The State argues that even if the TopGlock receipt, the instructions for assembling and disassembling a Glock, and the copies of the victim's schedule are excluded, the evidence is more than sufficient to support Niles's conviction for first degree premeditated murder. Although we agree, we note that our analysis of the sufficiency of the evidence includes all of the evidence presented at trial, regardless of its admissibility. State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981).

The record contains overwhelming evidence of premeditation. When the police conducted a firearms trace on the Glock handgun found in Niles's car at the time of his arrest, they discovered that Niles had purchased the Glock handgun and the ammunition at the Outpost Armory on December 19, 2010. Niles's bank records also showed that he had made a purchase from TopGlock's website on December 20, 2010, the next day. The fact that Niles procured the weapon, the ammunition, and the replacement parts so close in time to the victim's death is indicative of premeditation.

The record also contains evidence indicating an attempt to conceal the crime prior to the killing. At the time of Niles's arrest, the police found a nine-millimeter Glock as well as a spare barrel, spare firing pin, and a Glock assembly tool in Niles's car. The barrel in the Glock had a different serial number than on the frame and slide. Moreover, testing revealed that the shell casings recovered from the crime scene exhibited characteristics showing that they had been fired with a different barrel and firing pin than the stock barrel and firing pin for Niles's Glock. Finally, Niles confessed to Officer Farrell that he had conducted online research on how to defeat ballistics testing through the use of a replacement barrel and firing pin. Sufficient evidence was presented from which the jury could have inferred that Niles had attempted to defeat ballistics testing prior to killing the victim.

Additional evidence indicative of Niles's attempt to conceal the crime prior to the offense were the gloves and ski mask that were found in Niles's car. Testing established that one of the gloves showed traces of gunshot residue, which indicated that it had been in contact with or near a gun when it was fired. The jury could have reasonably inferred that

Niles wore the gloves at the time he shot the victim so that he would not leave fingerprints on the gun. The jury could have also reasonably inferred that Niles wore the ski mask at the time of the offense to avoid identification, especially given Niles's admission to Officer Farrell that he wore the ski mask when he shot the victim.

In addition, the type of ammunition used to commit the offense was indicative of Niles's intent to kill the unarmed victim, rather than injure her. Hollow point rounds, which are designed to cause extremely serious injuries, were found in the Glock handgun in Niles's car and in the victim's body. A jury could have reasonably inferred that Niles's purchase of hollow point bullets rather than traditional rounds indicated that he intended to kill the victim. In addition, the fact that the victim was shot in the head and the neck was also indicative of Niles's intent to kill the victim.

The evidence presented at trial showed that Niles essentially admitted to acting with premeditation when he killed the victim. Niles told Officer Farrell that even though he considered leaving the victim's apartment, he ultimately decided to stay and kill the victim. He also told Officer Farrell that he killed the victim because he believed that she was an unfit mother, which provided a motive for the killing. The fact that Niles and the victim had been involved in a contested custody battle over their four-year-old son was also indicative of motive.

The State argues that Niles places particular emphasis on the fact that the police seized the victim's work schedule from the date planner, which allowed the jury to infer that Niles knew when to shoot the victim because he knew her work schedule. The State argues, and we agree, that this one small piece of evidence was inconsequential in light of the overwhelming evidence of premeditation. Moreover, we also agree with the State's assertion that Niles "dramatically overstates the extent to which the State's case of premeditation depended on evidence seized from the defendant's home and dramatically understates the value of the evidence that had nothing to do with the purportedly unlawful search and seizure." We conclude that there was more than sufficient evidence supporting Niles's conviction for first degree premeditated murder.

**III. <u>Denial of Funds for Psychiatrist.</u>** Niles argues that the trial court abused its discretion in denying his <u>ex parte</u> motion for funds for a psychiatrist, thereby violating not only Supreme Court Rule 13 but also his constitutional right of due process and the right to present a defense as stated in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution. Specifically, he claims his attorneys established a particularized need for the expert services of a psychiatrist in his case because they asserted that the requested services were necessary

to prove his mental state at the time of the offense, which would likely be a significant issue in his defense at trial.

In response, the State contends that the trial court properly denied Niles's request because he failed to show a particularized need for expert psychiatric services, given that the court-ordered forensic evaluation determined that Niles was competent to stand trial and was not insane at the time of the offense.

Tennessee Supreme Court Rule 13, section 5(a)(1) states:

> In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an ex parte hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

A trial court's denial of expert services will not be reversed on appeal absent a showing that the trial court abused its discretion. State v. Barnett, 909 S.W.2d 423, 431 (Tenn. 1995). "Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services . . . ." Tenn. Sup. Ct. R. 13 § 5(c)(1). In criminal cases, a particularized need "is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial." Id. § 5(c)(2) (citing Barnett, 909 S.W.2d at 423). Similarly, the Tennessee Supreme Court adopted a two-pronged test to determine whether a defendant has established a "particularized need" for expert services: "(1) the defendant must show that he or she 'will be deprived of a fair trial without the expert assistance'; and (2) the defendant must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of [the] case.'" State v. Scott, 33 S.W.3d 746, 753 (Tenn. 2000) (quoting Barnett, 909 S.W.2d at 430). In Barnett, the Tennessee Supreme Court provided guidance for determining whether an authorization for psychiatric expert services is appropriate:

> Accordingly, before an indigent defendant is entitled to the assistance of a state-funded psychiatric expert, the defendant must make a threshold showing of particularized need. To establish particularized need, the defendant must show that a psychiatric expert is necessary to protect his right to a fair trial. Unsupported assertions that a psychiatric expert is necessary to counter the State's proof are not sufficient. The defendant must demonstrate

-19-

by reference to the facts and circumstances of his particular case that appointment of a psychiatric expert is necessary to insure a fair trial. Whether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made.

Barnett, 909 S.W.2d at 431; Tenn. S. Ct. R. 13 § 5(c)(1)-(2). Tennessee Supreme Court Rule 13 section 5(c)(4) states that particularized need "cannot be established and funding requests should be denied" in the event that the motion contains only:

(A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Tenn. S. Ct. R. 13 § 5(c)(4).

"Courts are not required to find the defendant an expert who will support his theory of the case." Ruff v. State, 978 S.W.2d 95, 101 (Tenn. 1998) (citing Ake v. Oklahoma, 470 U.S. 68, 83 (1985); Barnett, 909 S.W.2d at 431). Like the defendants in Ruff and Barnett, Niles requested and received a state-funded forensic evaluation, which determined that he was competent to stand trial and that the insanity defense could not be supported, before he requested a second evaluation by a psychiatric expert of his choosing. Ruff, 978 S.W.2d at 100; Barnett, 909 S.W.2d at 425. The defense presents no evidence that the expert who conducted the forensic evaluation in this case was unaware that Niles had made statements about God telling him to kill the victim.

Here, defense counsel generally argued in the ex parte motion that he "lack[ed] the knowledge, competence, experience, time[,] and resources to ferret out, organize[,] and effectively present the crucial pieces of information that form the basis of Mr. Niles's life story which this expert can provide, which [will] afford Mr. Niles an adequate defense to the offenses alleged in this case." The motion also asserted that "[t]he defendant claims to have

psychotic thoughts and is d[el]usional at times." Finally, the motion argued that "[a] psychiatrist is . . . necessary to determine whether there is any evidence to rebut the elements of the alleged crime and/or factors, as well as to determine whether evidence of any mitigation circumstances exist." After conducting the ex parte hearing, the trial court entered an order denying the motion on the basis that Niles had failed to establish a particularized need for the expert services of a psychiatrist for the following reasons: (1) Niles had already received a psychological forensic evaluation that determined that he was competent to stand trial and not insane; (2) the State had not filed a notice seeking the death penalty or life without parole; (3) Niles's statement regarding God or the devil telling him to kill the victim "could just as easily be the product of a guilty conscious rather than the result of a mental disease or defect[;]" and (4) there was no evidence presented that Niles suffered from a head injury or mental retardation, no evidence that he attended special education classes, and no evidence that Niles had ever seen a counselor, therapist, psychologist, or psychiatrist for any mental or emotional problems.

Upon review, we conclude that the trial court did not abuse its discretion in denying Niles's request for funds for a psychiatrist. The record shows that Niles provided only unsupported assertions that a psychiatrist might have been of assistance in his case; therefore, he failed to show that testimony from his requested expert was necessary in order to receive a fair trial. See State v. Wade P. Tucker, No. M2004-02792-CCA-R3-PC, 2005 WL 3132387, at *9 (Tenn. Crim. App., at Nashville, Nov. 22, 2005), perm. app. denied (Tenn. May 30, 2006) (concluding that because the defendant "provided only unsupported assertions that independent scientific experts may have been helpful to his case[,]" he "failed to demonstrate that independent expert testimony was 'necessary' to insure he received a fair trial."). Accordingly, Niles is not entitled to relief on this issue.

## CONCLUSION

We conclude that the trial court properly denied the motion to suppress, that the evidence was sufficient to sustain the conviction for first degree premeditated murder, and that the trial court did not abuse its discretion in denying the ex parte motion for funds for a psychiatrist. The judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-21-